DECISION.
The city of Springdale filed an appropriation action involving a building owned by defendants-appellees Sam and Eleanor Burns. Several small businesses operated from the building under commercial leases with the Burnses. Since they were to be affected by Springdale's appropriation, all of the businesses were properly named as co-defendants in the proceedings.
After a jury had determined the total value that Springdale would be required to pay for its appropriation of the building, the various businesses moved the court to distribute a portion of the award according to their own respective property interests in the building.[1] These interests primarily consisted of the businesses' leasehold rights and their rights to compensation for what they believed were business fixtures on the property.
Three of the co-defendants now object that the share of the total appropriation that the trial court awarded to each of them was too small. Defendants-appellants Timothy and Jennifer Tefs, operators of a Subway Restaurant, raise two issues related to the trial court's calculation of their compensable leasehold interest. The Tefses complain that the court incorrectly used what it believed to be their new lease rate, rather than a fair-market rental rate, to calculate the difference in rent that they would be entitled to receive over the unexpired term of their lease with the Burnses. They also believe that while the court increased the rent that they would have been required to pay under the terms of their lease with the Burnses, the court neglected to assume that the fair-market rental rate would have also increased. In addition to their concerns over the way the trial court calculated the value of their property interest in the remainder of their lease, the Tefses also complain that the court erred in failing to award them the value of their business fixtures.
Another defendant-appellant, Elmer Valentine, was operating Corky's Barber Shop in the Burnses' building. He believes that, even though he continued to operate in his original location by agreement with Springdale until the expiration of his lease, he was still entitled to receive an award equal to the difference between the rent he paid and the fair-market value of rent in a comparable location. He also believes that the court erred in failing to award him the value of his trade fixtures — three barber chairs and a back bar.
The remaining defendant-appellant, We Sew Alterations, Inc., also objects to the trial court's calculation of the distribution representing the value of its leasehold interest. It contends that the court improperly excluded from its calculation an additional five-year term available to We Sew under a renewal option in its lease, even though We Sew had notified the Burnses that it would relocate rather than renew its lease. We Sew also protests that the court erred in failing to award it various move-related compensation, including a new sign, transportation expenses, and some general repairs.
The Burnses have very little to say in response. They make no arguments and cite no law or statutes in support of their position. Instead, the Burnses briefly refer us to the trial court's decision and the evidence, asking simply that we affirm that decision.
For the reasons that follow, we reverse part of the trial court's judgment and remand this case for a recalculation of the Tefses' and We Sew's leasehold interest. We affirm the judgment as it relates to Valentine's lease, all parties' fixtures, and We Sew's claims for moving-related expenses.
I. The Leases
It is generally accepted that "in an appropriation proceeding both the owner and one having a leasehold interest in property may assert claims for damages and be compensated for whatever loss directly results from the appropriation."[2] With respect to the value of the lease, the leaseholder is entitled to receive a distribution from the total value of the property equal to "the market value of the right to use the property for the unexpired term over and above the amount of rent he is obligated to pay under the provisions of his lease."[3] This proposition, which typically awards the benefit of the renter's premium to the renter, assumes that the parties have not altered their respective rights by agreeing otherwise.[4]
The Burnses, the Tefses, Valentine, and We Sew all seem to agree on the foregoing, relatively straightforward statements of the law. But each business owner claims that the trial court incorrectly applied the law to the details of its particular distribution. We agree that the trial court incorrectly calculated the worth of the Tefses' and We Sew's leasehold interests, but we reject Valentine's contention.
A. The Tefses
The Tefses claim that the trial court made two errors in calculating the distribution that was to compensate them for the value associated with the loss of their lease. First, they claim that the trial court incorrectly subtracted the rent that they were to have paid under the lease from a "new lease" the trial court believed that they had secured, rather than from the fair market value of comparable property. The Tefses also believe that, while it was proper for the court to have increased the annual amount that they would have been required to pay under their existing lease by the escalator provided in the contract, the court improperly ignored that the corresponding fair market value of comparable property would have also increased. We sustain both assignments of error.
The Tefses are to be compensated for the taking of their leasehold interest. This necessarily involves determining what they would have paid under their existing lease and subtracting that from the fair-market rental value of that, or equivalent, property.[5] Whatever the Tefses had negotiated to pay in a new lease for a new business location would have been irrelevant, unless the trial court determined that the new lease would have been the best evidence of the fair rental value of a comparable building. Nothing in the court's decision indicates that this was the case. But there is evidence in the record to suggest that the fair-market rental value was higher than what the court believed to be the Tefses' new rate in another location.
In addition, the trial court erred by applying an inflationary factor to only one side of the equation to determine the premium to which the Tefses were entitled. The court considered inflation related only to their lease with the Burnses, not to the corresponding fair-market rental value. In determining the value of an appropriated leasehold interest, the Ohio Supreme Court has stated that "it is proper to consider * * * any increase or decrease in the market value of the realty during the term of the lease."[6] Since unrebutted testimony was presented on the projected increase in the fair-market rental value of property in the area, we conclude that it was an oversight on the part of the trial court to have excluded this factor from its calculation.
We remand this aspect of the case to the trial court for a revised valuation of the Tefses' leasehold interest.
B. Valentine
Springdale took possession of the Burnses' building directly after the jury determined its total value. But Valentine's lease expired just four months later, and Springdale allowed Valentine to continue operating Corky's Barber Shop from the Burnses' building for the remaining four months.
Despite the fact that Valentine continued uninterrupted operation of his business through the end of his lease and was not dispossessed, Valentine maintains that he is entitled to an appropriation award because he was a leaseholder at the time of the taking. He believes that the trial court "mysteriously" confused the issue of damages with his entitlement to participate in an appropriation award.
Valentine claims that there is no authority for the trial court to have rejected his claim. Valentine is incorrect, though it is true that the court did not mention the authority. As early as 1921, this court restated the rule that "a tenant permitted to occupy the land until the expiration of the term is not entitled to compensation, although proceedings to condemn are begun before his lease expires."[7] No subsequent cases have modified this holding, and the logic remains as valid today as it was in 1921. The purpose of an appropriation award is to compensate the leaseholder for the value of his appropriated interest. In this case, Valentine received the full value of his interest by maintaining his business in its location until the lease expired.
We overrule Valentine's assignment of error pertaining to his leasehold interest.
C. We Sew
We Sew's predicament requires us to extend existing case law to new circumstances. We Sew's lease was to have expired at the end of the year in which the appropriation occurred, but it also had a renewal option to extend the lease for another term. Although it was not required to do so, We Sew elected to relocate its business before the lease had expired. It moved out, paid rent for the remainder of the original lease term, and also notified the Burnses that it would not, under the circumstances, exercise its right to renew the lease presumably because the building would no longer be habitable.
The trial court acknowledged that an unexercised option to renew a lease should generally be included in determining the value of a leaseholder's property interest.[8] But the court ultimately concluded that by notifying the Burnses of its intent not to renew the lease, We Sew had relinquished the right to renew and, in essence, waived its option.
There is some degree of merit to the trial court's decision. As a corollary to the present circumstances, there is case law to support the proposition that a leaseholder is not entitled to compensation for an unexercised option to purchase.[9] But we believe the better rule of law is that, at least in terms of an option to renew a lease, it is the "right of renewal, not the probability or improbability of its exercise, that is to be considered."[10]
Further, we also believe that it is the existence of the right to renew the lease at the time the leaseholder is notified of the impending appropriation that is to be considered. Were we to hold otherwise, a tenant would be required to engage in maintaining the fiction that it intends to renew a lease in a building that everyone knows will be appropriated and will be of no further use to the leaseholder or owner. Exercising a renewal option on a condemned building would be a vain act.
We sustain We Sew's assignment of error as it relates to the value of its leasehold interest and remand this aspect of the case to the trial court so that it may include the value of We Sew's renewal option in its calculation.
II. The "Fixtures"
The Tefses, Valentine and We Sew each claim that the trial court erred in failing to award them compensation for the taking of business equipment that they believe had attained the status of "fixtures." The first and ultimately crucial issue, common to each claim, is whether each of the business owners proved that the items in question were indeed fixtures. If the business owners were unsuccessful in proving that the items for which they claimed compensation were fixtures, then they would have remained personal property, which is not compensable in an appropriation action.
It is well settled in Ohio appropriation cases that "although personal property which has attained fixture status is part of the real property taken, personal property, per se, is not taken and is therefore not compensable."[11] Where the condemning authority seeks to acquire only real property, "it will not be required to pay for other annexed property which it does not want and for which it has no need unless fundamental notions of fairness require it to do so."[12] The first step, then, in deciding whether a business tenant may be compensated for business improvements that it made to the real property is to determine whether the improvements were fixtures or personal property. If the improvements were personal property, neither the landlord nor the tenant should be compensated.
As early as 1853, the Ohio Supreme Court defined the term "fixture," providing three criteria to be used in identifying what constitutes a fixture. "A fixture is an article which was a chattel, but which by being physically annexed or affixed to the realty, became accessory to it and part and parcel of it."[13] This definition has proved enduring. A modern definition that describes a fixture as "`[a]n article that was once personal property, but has since been installed or attached to the land or building in a rather permanent manner, regarded in law as part of the real estate,'" has been regarded as essentially equivalent to the original definition promulgated in 1853.[14]
On the other hand, the criteria that are to be used to determine whether a business improvement of personal property has attained the status of a fixture have been enhanced since 1853. Originally, three criteria were considered: (1) annexation of the improvement to the property or something appurtenant to the property; (2) appropriation of the improvement to the use of the realty to which it is attached; and (3) the intent of the party who attached the improvement to make the attachment permanent.[15] These three criteria remain the foundation of our analysis, though the relative importance of the three has shifted, and their significance has been somewhat dependent on the type of case.
Since 1853, the first criteria has diminished in importance relative to the other two, regardless of the nature of the underlying case. Personal property may be considered a fixture even though only slightly,[16] or constructively,[17] attached to the real estate, provided that the other two criteria are met. Conversely, even a high degree of attachment to the realty will not necessarily result in personal property being considered a fixture if the other criteria are not met.[18] Here the relative importance of the remaining two criteria diverge, and which one is emphasized becomes dependent on the type of case to which they are applied.
In subsequent cases where the impetus of the underlying action was not appropriation, the primary emphasis was on the second of the three criteria the extent to which the item benefited the real property. The key consideration was "whether the chattel under consideration * * * is devoted primarily to the business conducted on the premises, or whether it is devoted primarily to the use of the land upon which the business is conducted."[19] These cases emphasized that, to attain the status of a fixture, personal property affixed to real property must generically improve the real property, not primarily benefit the particular type of business in which the current occupier is engaged.
The foregoing, non-appropriation cases may be a "valuable aid" in determining whether personal property has become a fixture for appropriation purposes.[20] But, in an appropriation case, the emphasis is more appropriately placed on the third criteria the "intention of the annexing party" to make that attachment permanent.[21] A court should determine the intent of the annexing party by considering all the relevant facts of a particular case, including the nature of the property, how and why the property was attached to the realty, the potential damage to the property and the realty if it were to be removed, the expense of removal, and any other express or implied indication that the annexing party intended to irrevocably dedicate the property to the realty.[22]
With these criteria in mind, we affirm the trial court's decision that the business owners were not entitled to a portion of the Burnses' award for what they claimed were fixtures. The record does not demonstrate that the Tefses, Valentine, or We Sew intended to permanently affix their personal business property to the real property that they leased. Secondarily, we also note that the improvements were devoted primarily to benefit their own respective businesses, not to generically improve the Burnses' property for the benefit of anyone that might succeed their occupancy.
A. The Tefses
At trial, the Tefses admitted a list of what they considered to be fixtures that they had left in the appropriated building and for which they were seeking to be compensated. Mr. Tefs testified that the criteria that he had used in compiling the list was whether the item could be removed without damage. While this is one of the factors to consider in determining whether the Tefses intended to affix the property to the realty permanently, it is not in this case sufficient.
The items on the list consisted of a large pole sign, glass sneeze guards, a safe, mirrors, floor panels, food storage racks, vinyl counters, and Subway motif wallpaper. The Tefses offered no evidence concerning the extent of damage to the realty or personal property should the items be removed. Nor did they offer any evidence concerning the expense of removal. There is no other express or implied indication that the Tefses intended to permanently improve the realty with their attached property. We also note that the items claimed by the Tefses would have been of benefit primarily to a succeeding Subway restaurant, not to a subsequent business of another type.
Based on the lack of evidence in the record that would have allowed the trial court to determine that the Tefses intended to permanently attach the list of items for which they sought compensation, we affirm the trial court's judgment. The Tefses' assignment of error related to their "fixtures" is overruled.
B. Valentine
Valentine also assigns error to the trial court's failure to award him compensation for his "fixtures." The record again does not demonstrate that Valentine intended to permanently affix his personal business property to the real estate.
The items for which Valentine sought to be compensated were three barber-shop chairs and a "back bar." The "back bar" was Formica-topped and consisted of lighted mirrors, two sinks, and a sterilizing tool.
Valentine testified that he had previously moved the barber-shop chairs when he had relocated within the Burnses' building many years ago. Thus the chairs had been movable personal property previously, and Valentine offered no evidence to indicate that their status would have changed in their new location.
With regard to the "back bar," Valentine stated that it was connected to the building's electricity and plumbing. This alone would have been an insufficient basis for the trial court to have concluded that Valentine intended to attach the "back bar" permanently to the real estate. Further, Valentine admitted that the "back bar" was unsuited to any type of business other than an operating barber shop.
Valentine failed to prove at trial that his personal property should have been deemed "fixtures." We thus affirm the trial court's determination that Valentine was not entitled to receive a distribution of the appropriation award for his barber chairs and "back bar."
C. We Sew
We Sew believes that the trial court erred in failing to award it compensation for a new sign, moving expenses, and certain unspecified repairs. To the extent that this assignment of error seeks to characterize a sign as a compensable "fixture," it is overruled. There is no evidence in the record that would have allowed the trial court to award We Sew compensation for a trade sign.
To the extent that this assignment of error seeks to compensate We Sew for the incidental hardships of relocating a business, it is also overruled. We Sew offers no case or statutory authority to support the proposition that a business tenant's moving expenses, repairs or replacement advertising are compensable in an appropriation. To the contrary, there is generally no provision for the payment of relocation expenses in an appropriation.[23] This is not to say that We Sew and the Burnses could not have agreed by contract to an alternate allocation of the Burnses' appropriation award. But We Sew cites no provision in its lease that the parties had so agreed.
Thus, We Sew's assignment of error pertaining to relocation expenses, repairs, and a new sign is overruled.
In summary, we reverse that part of the trial court's judgment pertaining to the valuation of the Tefses' and We Sew's leasehold interests and remand the case for recalculation of those interests. But we affirm the court's decision not to award Valentine compensation for his fully performed lease or "fixtures." We also affirm the court's decision denying a distribution to the Tefses for their claimed "fixtures," and to We Sew for its "fixtures" or relocation expenses.
Hildebrandt, P.J. and Winkler, J., concur.
Please Note:
The court has recorded its own entry on the date of the release of this Decision.
[1] See R.C. 163.18.
[2] See Cincinnati v. Spangenberg (1973), 35 Ohio App.2d 168, 170,300 N.E.2d 457, 459.
[3] See Frownfelter v. Graham (1959), 169 Ohio St. 309, 159 N.E.2d 456, paragraph two of the syllabus. See, also, Pokorny v. Local No. 310,Internatl. Hod Carriers Bldg. and Common Laborers Union of America
(1974), 38 Ohio St.2d 177, 181, 311 N.E.2d 866, 869; Columbus v.Huntington Natl. Bank (1956), 75 Ohio Law Abs. 214, 143 N.E.2d 874, 877.
[4] See Carroll Weir Funeral Home v. Miller (1965), 2 Ohio St.2d 189,191, 207 N.E.2d 747, 749.
[5] See Queen City Realty v. Linzell (1957), 166 Ohio St. 249,251-252, 142 N.E.2d 219, 221; Cincinnati v. H. S. Pogue Co. (1966),8 Ohio App.2d 293, 294-295, 221 N.E.2d 717, 718-719.
[6] See Frownfelter v. Graham (1959), 169 Ohio St. 309, 159 N.E.2d 456, paragraph three of the syllabus.
[7] See Cincinnati v. Schmidt (1921), 14 Ohio App. 426, citingSchreiber v. Chicago E.R. Co. (1885), 115 Ill. 340, 3 N.E. 427.
[8] See In re Appropriation of Lands of Sproat (1969),20 Ohio App.2d 166, 169, 252 N.E.2d 322, 324, citing Corvington v.Heppert (1952), 156 Ohio St. 411, 103 N.E.2d 558, paragraph two of the syllabus.
[9] See State v. DeLay (1959), 87 Ohio Law Abs. 449, 181 N.E.2d 706, 708-709.
[10] See Sproat, supra, at 170, 252 N.E.2d at 325.
[11] See Masheter v. Boehm (1974), 37 Ohio St.2d 68, 72, 307 N.E.2d 533,537, citing Lucas v. Carney (1958), 167 Ohio St. 416, 149 N.E.2d 238.
[12] Id. at 75, 307 N.E.2d at 539.
[13] See Teaff v. Hewitt (1853), 1 Ohio St. 511, 527.
[14] See Litton Systems, Inc. v. Tracy (2000), 88 Ohio St.3d 568, 572,728 N.E.2d 389, 392, quoting The Dictionary of Real Estate Appraisal (1984), 127.
[15] See Teaf v. Hewitt (1853), 1 Ohio St. 511, 530.
[16] See Holland Furnace Co. v. Trumbull S. L. Co. (1939),135 Ohio St. 48, 53, 19 N.E.2d 273, 275.
[17] See XXth Century Heating Ventilating Co. v. Home Owners' LoanCorp. (1937), 56 Ohio App. 188, 192, 10 N.E.2d 229, 231.
[18] See Masheter v. Boehm (1974), 37 Ohio St.2d 68, 73, 307 N.E.2d 533,538, citing Holland Furnace Co. v. Trumbull S. L. Co. (1939),135 Ohio St. 48, 19 N.E.2d 273.
[19] See Zangerle v. Standard Oil Co. of Ohio (1945), 144 Ohio St. 506,516, 60 N.E.2d 52, 57. See, also, Zangerle v. Republic Steel Corp. (1945), 144 Ohio St. 529, 640 N.E.2d 170, paragraph seven of the syllabus; Cleveland Elec. Illuminating Co. v. Continental Express
(1999), 106 Ohio Misc.2d 19, 22-23, 733 N.E.2d 328, 330-331; Pine CreekFarms v. Hershey Equip. Co. (July 7, 1997), Scioto App. No. 96CA2458, unreported.
[20] See Masheter v. Boehm (1974), 37 Ohio St.2d 68, 73, 307 N.E.2d 533,538.
[21] Id. at 74, 307 N.E.2d at 538-539. See, also, Scott v. Keysor
(1999), 132 Ohio App.3d 456, 459, 725 N.E.2d 347, 349; State ex rel.Fisher v. Waterfront Elec. Ry., Inc. (1993), 63 Ohio Misc.2d 507, 511,635 N.E.2d 81, 84.
[22] See Masheter at 77, 307 N.E.2d at 540.
[23] See Bd. of Cty. Commrs. of Hamilton County v. Flanco Realty Co. (June 25, 1999), Hamilton App. Nos. C-980781, C-980803, and C-980822, unreported, citing Wray v. Parsson (1995), 101 Ohio App.3d 514, 520,655 N.E.2d 1365, 1369.